# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GLORIA WILLIAMS-KATES** | **CIVIL ACTION** |
| **VERSUS** | **NO: 12-772-SS** |
| **JANET NAPOLITANO,**<br>**SECRETARY, U.S. DEPARTMENT**<br>**OF HOMELAND SECURITY** | |

## ORDER AND REASONS

For the reasons described below, the motion of the defendant, Janet Napolitano, Secretary U.S. Department of Homeland Security ("DHS"), for summary judgment. (Rec. doc. 40) is granted.

## Procedural Background

The plaintiff, Gloria Williams-Kates, filed a complaint for employment discrimination. She was represented by counsel. Rec. doc. 1. A few months after filing the complaint, her counsel withdrew. Rec. doc. 7. Ms. Williams-Kates appears in proper person. DHS filed an answer. Rec. doc. 17. On September 25, 2012, the parties consented to disposition by the assigned Magistrate Judge. Rec. doc. 21.

On March 26, 2013, DHS filed its motion for summary judgment. Rec. doc. 40. Ms. Williams-Kates filed a one page opposition stating that she was unable to present facts essential to justify her opposition. Rec. doc. 41. She filed a motion to compel, rec. doc. 42, which was denied. Rec. doc. 51. Her supplemental memorandum in opposition to the motion for summary judgment was filed and two volumes of exhibits were filed. Rec. docs. 50 and 59. DHS filed a reply memorandum. Rec. doc. 58.

**Plaintiff's Complaint**

Ms. Williams-Kates alleges that: (1) she was employed as an Equal Employment Assistant within the Louisiana Transitional Authority ("LTRO") from 2005 until her termination on July 3, 2010; (2) DHS assigned her to work for LTRO in its New Orleans office; (3) in the year preceding her termination she participated in activities protected by Title VII which led to her termination; (4) in July 2009, she requested EEO counseling regarding discriminatory conduct committed by her supervisor, Deborah Chapman ("Chapman"); (5) between November 2009 and her termination, she filed multiple official EEO complaints concerning Chapman's actions; (6) she believed that Chapman's actions were discriminatory based on her age, disability and gender; (7) after she engaged in protected activities, Chapman began to retaliate against her; (8) Chapman relocated her workspace, denied her multiple leave requests, held her to disparate leave standards from other employees who did not engage in protected activities, issued written reprimands to her without merit, and caused her termination; and (9) she filed a formal EEO complaint for Chapman's discriminatory and retaliatory actions.

**Undisputed Facts**

Pursuant to L.R. 56.1, "[e]very motion for summary judgment must be accompanied by a separate and concise statement of the material facts which the moving party contends present no genuine issue." DHS provided a statement of undisputed facts in support of its motion. Rec. doc. 40 (Attachment). Ms. Williams-Kates submitted a statement of disputed facts. Rec. doc. 50 (Attachment). The following is adapted from the DHS statement of undisputed facts with a summary of Ms. Williams-Kates' response.

1. FEMA is an Agency in DHS and is responsible for, among other activities, administering and coordinating the Federal governmental response to disasters pursuant to the Stafford Act. Ms. Williams-Kates responds that she must review the statute.

2. Responding to natural disasters creates special staffing requirements. FEMA is authorized by statute to hire temporary personnel outside certain requirements of Title 5 of the U.S.C. to perform disaster and emergency services for which it does not have adequate full-time employees, including: (a) Disaster Assistance Employees ("DAEs") - intermittent and temporary employees; (b) Local Hires - temporary employees serving 120 day appointments; and (c) Cadre of On-Call Response Employees ("COREs") - temporary positions with renewable two or four-year appointments. Ms. Williams-Kates contends that FEMA was recently authorized to transition some of its non-permanent workforce to permanent positions.

3. Following Hurricane Katrina, a recovery office was established in Louisiana in multiple locations.

4. On September 27, 2005, FEMA hired Ms. Williams-Kates for a temporary, excepted service position as a Local Hire at LATRO in Baton Rouge. Her position had a "not-to-exceed date" of January 25, 2006. Ms. Williams-Kates' Local Hire position was subsequently extended twice to September 25, 2006.

5. As LATRO transitioned to long-term recovery, the Office of Equal Rights ("OER") was authorized to hire COREs. The COREs served as replacements to both DAEs, volunteers from other Federal agencies, and Local Hires. The original authorization was for 10 employees (two-year appointments) to include Equal Employment Opportunity ("EEO"),

Civil Rights, and administrative personnel. There was one EEO Assistant for the office; there were two secretarial positions (one in Baton Rouge and one in New Orleans) to support the office; and the remainder served as EEO or Civil Rights specialists. Ms. Williams-Kates contends that the original authorization was for 11 employees.

6. On June 25, 2006, Pauline Campbell, Director of FEMA's Office of Equal Rights, hired Ms. Williams-Kates for a temporary, excepted service position as an EEO Assistant in the OER in LATRO Baton Rouge. The position was a CORE position with a not-to-exceed date of June 24, 2008. As an EEO Assistant, Ms. Williams-Kates's primary job responsibilities included EEO intake, administrative and clerical support, but not EEO counseling. Ms. Williams-Kates disputes the description of her duties as EEO Assistant.

7. On June 25, 2008, FEMA extended Ms. Williams-Kates' temporary appointment until June 25, 2009. On June 25, 2009, it extended her temporary appointment until June 25, 2010. Ms. Williams-Kates contends this is not relevant.

8. On June 24, 2009, Libby Turner, the Acting Deputy Director of LTRO announced to all employees that LATRO would be undergoing restructuring as the workload in response to Hurricane Katrina was decreasing. Ms. Turner stated that all functions within LRTO would be evaluated to determine what employees would be released. Ms. Williams-Kates denies that there was a notice directly from Deborah Chapman to right-size EEO employees in the New Orleans/Baton Rouge OER.

9. At the time of Ms. Turner's announcement, OER's temporary staff were already finding employment outside of the agency and in other positions within FEMA. Ms. Williams-Kates

lists at least ten persons and provides information on their departures.[1]

10. During one of Campbell's visits to the LTRO in mid-2009, she informed OER staff that she would be looking at the number of staff and the workload to determine the number of staff necessary to provide effective service. Subsequent to Campbell's visit, and before she made a determination on how many positions needed to be eliminated, three EEO specialists left. As a result, four staff remained in the OER office, (three EEO/Civil Rights Specialists and Ms. Williams-Kates). Ms. Williams-Kates refers to her response to No. 9.

11. Ms. Williams-Kates, as an EEO assistant, was responsible for case intake for EEO and civil rights cases, database tracking, and commemorative programs. Ms. Williams-Kates disputes the description of her responsibilities.

12. In 2010, the OER's workload continued to drop, the numbers of EEO complaints decreased from 50 in 2009 to 28 in 2010. Civil rights case activity dropped from 22 in 2009 to 3 in 2010. Campbell determined that, based on OER's ever decreasing workloads, the staffing structure of LATRO OER needed to change. Ms. Williams-Kates does not dispute the statistics but refers to an increase in "EEO Counseling requests." Rec. doc. 50 (Attachment at 16).

13. Following discussion with the informal complaints program manager and the local LATRO supervisor, Campbell made the decision to eliminate Ms. Williams-Kates' EEO assistant position. Ms. Williams-Kates states that she was not aware of this.

14. Campbell determined that it was more efficient to eliminate the EEO Assistant position

---

[1] For example, Mary Hollis, an EEO Assistant in May 6, 2009, is described as resigning and "not resized due to job issues." Rec. doc. 50 (Attachment at 8).

        because the three remaining EEO specialists could absorb the duties of the EEO assistant including performing their own intake and case tracking. On the other hand, the EEO assistant could not perform all of the duties of an EEO specialist. Ms. Williams-Kates contends that she was cross-trained in all OER jobs.

15. Campbell made the decision to release Ms. Williams-Kates for lack of work. However, as Ms. Williams-Kates' duty station was located at LATRO and being paid from its budget, it was LATRO who notified her that she was being released for lack of work. Ms. Williams-Kates states that she was not aware of this.

16. On June 4, 2010, LATRO notified Ms. Williams-Kates that she was being released from her temporary EEO Assistant position, effective July 3, 2010. Ms. Williams-Kates does not dispute this. Instead, she contends that it was not clear whether the termination was a right-sizing or a demobilization. She learned that it was due to a reorganization of the agency. She contends that she "should have been considered under the OPM guidelines." Rec. doc. 50 (Attachment at 18).

17. In late June or early July 2010, LATRO offered Ms. Williams-Kates an extension to her employment. The position was a detail with DHS to provide assistance with the Long Term Gulf Coast Restoration Support Plan, Federal Resource Coordination. The opportunity was unrelated to her previous position or OER and Ms. Campbell authorized an extension of Ms. Williams-Kates's employment for this detail. Ms. Williams-Kates contends that Human Resources requested the extension. She reports that she applied, without success, for a disaster assistance employee position on July 23, 2010. She contends that this was a DHS retaliatory act.

18. Initially, Ms. Williams-Kates's employment was extended for an additional two weeks. LATRO later requested that it be extended until September 11, 2010, which request was approved. Ms. Williams-Kates contends that this is not relevant to her claim.

19. On September 11, 2010, with the DHS detail complete, Campbell authorized Ms. Williams-Kates' release from her temporary position due to lack of work. Ms. Williams-Kates contends that DHS hired a new employee under the age of 40 on May 8, 2011.

20. Ms. Williams-Kates' EEO Assistant position was never backfilled. Ms. Williams-Kates responds that DHS backfilled the position for which she was more than qualified as a former Local Hire EEO officer.

21. The workload for OER's LATRO office continued to decline and by 2011, the number of EEO cases had dropped from 28 to 10. Ms. Williams-Kates does not dispute the statistics but raises an issue about the actual EEO counselings.

22. Chapman is a female and was born in 1958.

23. Ms. Williams-Kates is a female and was born in 1957.

24. FEMA has no record of Ms. Williams-Kates filing a formal complaint of discrimination other than the complaint which gave rise to the instant suit. Ms. Williams-Kates contends that her files show formal complaints were filed on December 28, 2009 and March 3, 2010.

## **Summary Judgment Standard**

Fed. R. Civ. P. 56 provides in pertinent part that summary judgment will be granted when "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106

S.Ct. 2548, 2552 (1986); and Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990). To that end, the court must "view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." Wyatt v. Hunt Plywood, 297 F.3d 405, 409 (5th Cir. 2002). Where the record taken as whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Washington v. Allstate Ins. Co., 901 F.2d 1281 (5th Cir. 1990).

Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case. Celotex, 106 S.Ct. at 2553; see Lujan, 110 S. Ct. at 3187. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Celotex, 106 S.Ct. at 2553-54. A dispute over a material fact is genuine, if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Kee v. City of Rowlett Texas, 247 F.3d 206, 210 (5th Cir. 2001).

This burden is not satisfied with "some metaphysical doubt as to the material facts," Matsushita, 106 S.Ct. at 1356, by "conclusory allegations," Lujan, 110 S. Ct. at 3180, or by only a "scintilla" of evidence, Davis v. Chevron U.S.A., Inc., 14 F.3d 1082 (5th Cir.1994). The court resolves factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. See Lujan, 110 S. Ct. at 3188. Summary judgment is appropriate in any

case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." Armstrong v. City of Dallas, 997 F.2d 62 (5th Cir.1993). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted. Evans v. City of Bishop, 238 F.3d 586, 588-89 (5th Cir. 2000).

In Fierros v. Texas Dept. of Health, 274 F.3d 187 (5th Cir. 2001), the Fifth Circuit cautioned that summary judgment is not favored in claims of employment discrimination and that the Supreme Court in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000), emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, which are jury functions, not those of a judge. Fierros, 274 F.2d at 190-91.

### Plaintiff's Claims

Ms. Williams-Kates alleges that the alleged discriminatory and retaliatory actions of DHS occurred because of her age, disability and/or gender. Rec. doc. 1 at 12. 42 U.S.C.A. § 2000e-16 is concerned with employment by the federal government. It provides that,

> All personnel actions affecting employees . . . in executive agencies as defined in section 105 of Title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin.

Id. There is a similar provision protecting federal employees from any discrimination based on age. 29 U.S.C. 633a(a). The Rehabilitation Act, 29 U.S.C. § 701, applies to claims for disability discrimination by federal employees.

After the withdrawal of her counsel, Ms. Williams-Kates attempted to amend to add Chapman as a defendant. The motion was denied as futile because Title VII does not impose

personal liability for the acts of federal employees. Rec. doc. 31.[2]

## **Disparate Treatment Claims**

Ms. Williams-Kates alleges that Chapman discriminated against her on account of her age, disability and gender. She alleges that Chapman: (1) relocated her workspace; (2) denied her multiple leave requests; (3) held her to disparate leave standards from other employees who did not engage in protected activities; (4) issued written reprimands to her without merit; and (5) caused her termination. Rec. doc. 1 at para. 7.

Ms. Williams-Kates' claims of disparate treatment are governed by the tripartite burden-shifting test.[3] To establish a *prima facie* case, a plaintiff must prove that (1) she was a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) she was treated less favorably because of her membership in that protected class than were other similarly situated employees who were not members of the protected class. McDonnell-Douglas, 93 S.Ct. at 1824.

DHS contends that Ms. Williams-Kates' claims fail to establish a *prima facie* case because Chapman's actions are not adverse employment actions. Only ultimate employment decisions, such

---

[2] In her memorandum, Ms. Williams-Kates alleges that:

Plaintiff suffered Defamation (slander and libel) in the work place, privacy breach, hostile work environment, harassment (workplace bully) based on retaliation because I filed EEO Complaint on November 18, 2009, as well as age, sex, reprisal, color, and disability. Hostile work environment, and harassment, and her medical history disclosed.

Rec. doc. 48 (Memorandum at 4). In a further memorandum, Ms. Williams-Kates also alleges that her termination was a violation of her rights as a veteran. Rec. doc. 50 (Memorandum at 23). Ms. Williams-Kates did not obtain leave to amend to assert these additional claims. Her claims are limited to those found in her original complaint.

[3] See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973) (Title VII claims); Seaman v. CSPH, Inc., 179 F.3d 297, 300 (5th Cir. 1999) (Rehabilitation Act claims); and Jackson v. Ca.-Western Packing Corp., 602 F.3d 374, 378 (5th Cir. 2010) (ADEA claims).

as hiring, granting leave, discharging, promoting, or compensating, are actionable as adverse employment actions for discrimination claims. McCoy v. City of Shreveport, 492 F.3d 551, 560 (5th Cir. 2007). The claims that her workplace was relocated and written reprimands were issued without merit are not ultimate employment decisions.

DHS contends that Ms. Williams-Kates does not present a *prima facie* case regarding her claims on denial of leave and her termination, because she cannot offer examples of similarly situated individuals outside her protected class that were treated more favorably. Ms. Williams-Kates contends that John W. Williams, an African-American male under the age of 40, and Heather Gremillion, an African-American female under the age of 40, were similarly situated to her and treated more favorably than she. Rec. doc. 50 at p. 7-8.

In Lee v. Kansas City Southern Ry. Co., 574 F.3d 253, 259 -260 (5th Cir. 2009), the Fifth Circuit stated:

> We have considered the requirement for one employee to be similarly situated to another on any number of occasions. Employees . . . who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under nearly identical circumstances. The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities. . . and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis.

574 F.3d at 259 -260 (footnotes and quotation marks omitted and emphasis in the original).

Following Hurricane Katrina LATRO had EEO offices in Baton Rouge and New Orleans.

The first person in charge of the two EEO offices was Beverly Powell.  She was followed in turn by Pamela Mack, Carol Nichols, Trevor Deveaux and Chapman. [4]  Nichols left in February 2009.[5] Deveaux left in 2009, and Chapman was placed in charge at that time.  She was in charge in October 2011.  Williams Deposition at 19.

From 2006 through 2011, there were significant changes in the staffing of the EEO offices. The original CORE staffing for the two EEO offices was 10 employees.[6]  By October 2011, there were 3 employees: (1) Chapman, the supervisor; (2) Williams in Baton Rouge; and (3) Heather Gremillion in New Orleans.  Williams Deposition at 19.  The relevant time begins when Chapman replaced Deveaux in 2009 and continues until Ms. Williams-Kates was terminated on June 24, 2010.[7]  When Chapman became the supervisor, the only other persons in the two offices were John Williams, Charles Bridgewater and Ms. Williams-Kates.  Williams Deposition at 40.  Bridgewater was demobilized in March or April of 2011.[8]  For the pertinent time period, the issue is whether John

---

[4] In support of her opposition, Ms. Williams-Kates provided the transcript of the deposition of John Wesley Williams, taken on October 24, 2011 in Baton Rouge. John Williams was questioned by counsel for Ms. Williams-Kates and DHS. The transcript is the last exhibit in the volume of exhibits which begins with a declaration from Ms. Williams-Kates. Hereafter references to the transcript of the John Williams deposition are cited as "Williams Deposition at ___"  The description of the persons in charge of the EEO offices is found at Williams Deposition at 15-17.

[5] Ms. Williams-Kates submitted a declaration from Carol Nichols, dated April 2, 2013. It is Exhibit 42 in the second volume of exhibits. On page 3, she stated that she left FEMA in 2009. Citations to this declaration are "Nichols Declaration at ___.

[6] Exhibit A in support of the DHS motion for summary judgment is the Declaration of Pauline Campbell. Attached to this exhibit are additional exhibits. Exhibit A-1 is a September 13, 2011 memorandum signed by Campbell. See Rec. doc. 40 (Exhibit A - Campbell Declaration [Exhibit A-1 - September 13, 2011 memorandum]) (hereafter "9/13/11 Staffing Memorandum").

[7] See Rec. doc. 40 (Exhibit A - Campbell Declaration [Exhibit A-8 - June 24, 2010 Memorandum from Joseph Threat to Ms. Williams-Kates]) (hereafter "6/24/10 Termination Notice").

[8] Williams Deposition at 25.  Williams testified that "rightsizing" and "demobilizing" are interchangeable terms referring to reductions in staffing prompted by reductions in the work available.

Williams, Bridgewater and Ms. Williams-Kates had the same job responsibilities.

John Williams began as an equal rights officer. He received a civil rights specialist position. After three or four years, he applied for and became a EEO specialist. Williams Deposition at 6. In the original CORE staffing, Bridgewater was a civil rights specialist.[9] Bridgewater also became an EEO specialist.[10] During the pertinent period, Williams and Bridgewater were EEO specialists. For the original CORE staffing, Ms. Williams-Kates was an EEO assistant.[11] She remained an EEO assistant until her termination. Williams Deposition at 22-23.

Although Ms. Williams-Kates did not have the same title as Bridgewater and John Williams during the pertinent period, it is necessary to consider their duties and responsibilities. Nichols testified that the initial position for Ms. Williams-Kates was Equal Rights Office counselor. When the CORE staffing was done, Ms. Williams-Kates became an EEO Assistant. Nichols Declaration at 1. Ms. Williams-Kates performed the same duties as other employees. She received the training provided to EEO counselors and specialists. Id. at 2. She was cross-trained as an EEO and civil rights counselor. Id. at 5. While the Nichols declaration demonstrates that Ms. Williams-Kates had the training to perform the responsibilities and duties of the two EEO Specialists, John Williams and Bridgewater, the issue remains as to whether she performed them during the relevant time.

Nichols had no personal knowledge of the situation after February 2009, when she left FEMA and moved to Colorado. Id. at 3. Nichols acknowledged that she could only speculate about

---

Williams Deposition at 26.

[9] 9/13/11 Staffing Memorandum.

[10] Rec. doc. 40 (Exhibit B - Dowling Declaration [Exhibit B-1 - Chapman Declaration, dated March 17, 2011, at p. 17]).

[11] 9/13/11 Staffing Memorandum.

the situation after she left. Id. at 4.[12] John Williams testified that when Ms. Williams-Kates first came to work she was an equal rights officer and did the same job that Chapman and others did. Williams Deposition at 20-21. At this time Ms. Williams-Kates did a lot of intakes in that she was the first person that an individual would come to if they felt that were a victim of discrimination. The individuals provided identification and background information. Ms. Williams-Kates was active with the special emphasis programs. Williams Deposition at 21-22. After the Hurricane Katrina activities moderated, the agency advertised for the civil rights specialist positions. At that time Ms. Williams-Kates' duties changed. She began doing more EEO intakes. She was called an EEO assistant. She did a lot of administrative duties once she assumed that role. These duties continued until she was terminated. Williams Deposition at 23. Since she left, Gremillion and Williams have done the EEO intakes and other administrative duties, for example mailing documents and ensuring that headquarters receives information. Williams Deposition at 23-24.

Ms. Williams-Kates had a different job title, EEO Assistant, from Bridgewater and Williams. Her duties and responsibilities were primarily administrative compared to the duties and responsibilities for Bridgewater and Williams. Ms. Williams-Kates was not similarly situated to Bridgewater and Williams. She does not present a *prima facie* case regarding her claims based on the denial of leave and her termination.

Assuming *arguendo* that Ms. Williams-Kates, Bridgewater and Williams were similarly situated, DHS contends that her claims of disparate treatment fail. Ms. Williams-Kates claims that

---

[12] Pursuant to Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Chapman denied her emergency leave request on December 14, 2009.[13] Chapman did not recall denying the request for emergency leave and to the best of her knowledge every leave request submitted by Ms. Williams-Kates was granted.[14] Charmaine Jiles, who was Chapman's supervisor, testified that she knew of no specific leave requests that were denied.[15] Jiles stated that while some requests were questioned, she knew of none that were denied. Id. Ms. Williams-Kates has not presented evidence that Chapman denied her request for emergency leave.

Ms. Williams-Kates alleges that Chapman caused the termination of her employment. Rec. doc. 1 at 3. On June 24, 2010, Joseph Threat, the Deputy Director Support Services for FEMA issued a notice of termination-discontinuation of position to Ms. Williams-Kates. The notice states:

> This memorandum serves as notification that your temporary appointment as a Katrina CORE employee is terminated, effective July 3, 2010, based on the discontinuance of your position. This determination has been made based on the reduction in functions and/or numbers of specific positions identified by the LRO Demobilization Task Force review.[16]

As already demonstrated, the Baton Rouge and New Orleans offices had shrunk from at least 10 positions when CORE staffing was authorized to only 3 when Chapman became supervisor in 2009.

Campbell states that in 2010 the workload continued to drop. The number of EEO complaints decreased from 50 in 2009 to 28 in 2010. Civil rights case activity dropped from 22 in

---

[13] Rec. doc. 40 (Exhibit B - Dowling Declaration [Exhibit B-6 - Ms. Williams-Kates Declaration, dated at p. 8]). Ms. Williams-Kates stated that she notified Ms. Chapman by email that neither she nor her husband could attend the office holiday celebration because he had a dental appointment and she had to accompany him to the appointment. Ms. Williams-Kates stated that Chapman said she would be AWOL if she went to the appointment. Id.

[14] Rec. doc. 40 (Exhibit B - Dowling Declaration [Exhibit B-1 - Chapman Declaration, dated March 17, 2011, at p. 9]).

[15] Rec. doc. 40 (Exhibit B - Dowling Declaration [Exhibit B-2 - Jiles Declaration, dated January 31, 2011 at p. 4-5]).

[16] 6/24/10 Notice of Termination.

2009 to 3 in 2010.  Rec. doc. 40 (Campbell Declaration at 4).  She determined that, based on OER's ever decreasing workloads the staffing structure of LATRO, OER needed to change.  Id.  While Ms. Williams-Kates does not dispute the statistics, she refers to an increase in "EEO Counseling requests."  Rec. doc. 50 (Attachment at 16).  Campbell states that following discussions with the informal complaints program manager and Chapman, Campbell made the decision to eliminate Ms. Williams-Kates' EEO assistant position.  Rec. doc. 40 (Campbell Declaration at 5).

Campbell states that she determined that it was more efficient to eliminate the EEO Assistant position because the three remaining EEO specialists (Chapman, Bridgewater and John Williams) could absorb the duties of the EEO assistant including performing their own intake and case tracking. Id. at 5.  This is consistent with John Williams' testimony that the administrative duties performed by Ms. Williams-Kates were assumed by him.  Williams Deposition at 23-24.  Campbell states that she made the decision to release Ms. Williams-Kates for lack of work.  Rec. doc. 40 (Campbell Declaration at 5).

Campbell states that while the EEO specialists, Bridgewater and Williams, could absorb the duties of the EEO Assistant, the EEO Assistant could not perform all of the duties of an EEO specialist. Id. at 5.  Ms. Williams-Kates disputes this and contends that she was cross-trained in all OER jobs.  She has produced evidence, for example the Nichols declaration, that she was trained to perform the duties of an EEO specialists.  This does not negate: (1) that the work load in the office, nearly 5 years after Katrina, was declining; and (2) that Campbell made the decision to terminate Ms. Williams-Kates.

If the plaintiff is able to demonstrate a *prima facie* case of discrimination, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for the action.  McDonnell

16

Douglas, 93 S.Ct. 1824.  DHS has met its burden at this point in the McDonnell Douglas analysis. It is incumbent on Ms. Williams-Kates to demonstrate that DHS' reason for terminating her was pretextual.  Her evidence to rebut the non-discriminatory reasons offered by DHS is not so persuasive as to support an inference that the real reason for her termination was discrimination. Rubenstein v. Administrators of the Tulane Educational Fund, 218 F.3d 393, 400 (5th Cir. 2000).

**Retaliation Claims**

Ms. Williams-Kates alleges that:  (1) in July 2009, she requested EEO counseling regarding Chapman's alleged discriminatory conduct; (2) after November 2009, she filed multiple EEO complaints with DHS concerning Chapman's alleged discriminatory conduct; (3) Chapman began retaliating against her; (4) Chapman terminated her; and (5) she filed a formal EEO complaint which included the retaliatory actions.  Rec. doc. 1 at 2-3.

> A plaintiff establishes a prima facie case of unlawful retaliation by proving (1) that she engaged in protected activity, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action.

Sherrod v. American Airline, Inc., 132 F.3d 1112, 1122, n. 8.  DHS contends that Ms. Williams-Kates cannot establish the third element required for the *prima facie* case.

Ms. Williams-Kates states that she made an informal EEO complaint against Chapman in August 2009 to Jiles, Chapman's supervisor, and a second informal complaint in November 2009. Williams-Kates Declaration at 3.  DHS contends that the only formal EEO complaint was the one which gave rise to Ms. Williams-Kates' suit.  It urges that without more than her allegations, she cannot establish that Chapman knew of the August and November 2009 complaints.  Therefore, Ms. Williams-Kates is unable to establish the casual link between the protected activity and what followed.

John Williams testified that: (1) Ms. Williams-Kates came to him and reported that she thought she was in a hostile environment (Williams Deposition at 27); (2) he asked if she was requesting EEO counseling (Id. at 31); (3) she replied in the negative (Id.); (3) he called Jiles, Chapman's supervisor, and reported the conversation to her (Id. at 31-32); (4) Jiles told him to tell Ms. Williams-Kates that she needed to bring her concerns to Jiles because she was Chapman's supervisor (Id. at 32); (5) Williams reported his conversation with Jiles to Ms. Williams-Kates (Id.); (6) Williams assumes that Ms. Williams discussed her concerns with Jiles because he recalled a meeting among Jiles, Chapman and Williams-Kates (Id. at 33); and (7) Williams was not a participant in such a meeting (Id. at 33). Jiles testified that: (1) she was not aware of any reprisal because of EEO activities; (2) she tried to assist and foster good will on the team.[17] Ms. Williams-Kates presented a copy of an email from her to Jiles, dated December 31, 2009, referring to a request for counseling in addition to the November 19, 2009 complaint. Exhibit 9 in Manual Attachment. Ms. Williams-Kates has established her *prima facie* case.

> Under *McDonnell Douglas,* if the plaintiff can establish a prima facie case of retaliation, the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action.

Sherrod, 132 F.3d at 1122. DHS has advanced a legitimate reason for the termination of Ms. Williams-Kates.

> If the defendant advances a legitimate reason for the adverse employment action, then the plaintiff must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation. Therefore, the ultimate issue is whether the employer unlawfully retaliated against the employee for exercising protected activity. The ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred "but-for" the protected activity. The plaintiff must reveal a conflict in substantial

---

[17] Rec. doc. 40 (Exhibit B - [Exhibit B-2 - Jiles Declaration, dated January 31, 2011, at 3]).

evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment. Evidence is substantial if it is of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions.

Id. (citations and some quotation marks omitted).

Ms. Williams-Kates has not presented substantial evidence that Campbell's decision to terminate her was done in retaliation for the concerns that she raised with Jiles and others concerning Chapman's conduct. Viewing the summary judgment evidence in the light most favorable to Ms. Williams-Kates, a "reasonable and fair minded person" would conclude that the explanation proffered by DHS was not a pretext for unlawful retaliation. Ms. Williams-Kates failed to establish that she would not have been terminated but for the alleged informal EEO complaints. A genuine issue of fact does not exist as to whether DHS unlawfully retaliated against Ms. Williams-Kates. Sherrod, 132 F.3d at 11223.

## Conclusion

Based on the undersigned's review of the record, Ms. Williams-Kates has failed to meet her summary judgment burden. Accordingly;

IT IS ORDERED that the motion of the defendant, Janet Napolitano, Secretary U.S. Department of Homeland Security ("DHS"), for summary judgment (Rec. doc. 40) is GRANTED.

New Orleans, Louisiana, this 7th day of June, 2013.

          **SALLY SHUSHAN**
          **United States Magistrate Judge**

**CLERK TO SERVE by U.S. Mail and by email:
wilkat@mybluelight.com**